**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:    1:23-cv-194

Vivos Therapeutics, Inc.,

                Plaintiff,

     v.

Dr. Gurdev Dave Singh, and Dr. Rod Willey,

                Defendants.

---

**EMERGENCY MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER**

---

      Plaintiff Vivos Therapeutics, Inc. ("Vivos"), through undersigned counsel, brings the following Emergency Motion for *Ex Parte* Temporary Restraining Order ("TRO") against Defendants Dr. Gurdev Dave Singh ("Singh") and Dr. Rod Willey ("Willey") to immediately restrain them from breaching the restrictive covenants and misappropriating Vivos' confidential trade secrets, and states as follows:

      **Certificate of Conferral:** Pursuant to D.C.COLO.LCivR 7.1(a), counsel for Vivos attempted to confer with counsel for Singh and with Willey when it sent each a cease-and-desist letter on December 15, 2022. However, counsel for Singh and Willey have failed to respond to the letters. Further, undersigned counsel has emailed a copy of the Complaint and its exhibits and this Motion and its exhibits to Singh's counsel and has placed a copy into the mail to Willey. *See* Exhibit 8, ¶¶ 4(a) and (b). Additionally, undersigned counsel has hired a process server to serve both Singh and Willey with the Complaint and its exhibits and this Motion and its exhibits. *Id.* at ¶ 4(c).

## INTRODUCTION

Singh, the former Chief Medical Officer ("CMO") whom Vivos terminated for cause, and Willey are illegally and improperly using Vivos' proprietary and confidential information related to its devices and methodologies, which are trade secrets. Singh's and Willey's use of the trade secrets to form a new business whose products, services, and activities compete with Vivos. Singh has caused irreparable and immediate harm by being a part of a business that competes with Vivos and targets the same customers as Vivos. Singh and Willey have caused irreparable and immediate harm by misappropriating Vivos' trade secrets. However, Singh and Willey will cause even further irreparable and immediate harm through an upcoming January 30, 2023 through February 1, 2023 conference, where it is believed Singh and Willey will conduct trainings that integrate Vivos' trade secrets.

Singh learned of these trade secrets during his employment with Vivos, and he knows he does not have the consent of Vivos to disclose the trade secrets. Further, Singh has a duty to maintain the confidentiality of the trade secrets. Singh instead disclosed the trade secrets to Willey, his business partner. Together, Singh and Willey have misappropriated the trade secrets into their new business, Koala Plus. Singh and Willey's new business provides training and services to dental and medical providers and their offices on innovative solutions to treat issues including sleep apnea.

Singh agreed to non-competition and non-solicitation as part of his employment agreements, following his termination for a period of twenty-four months. Singh was terminated on March 1, 2022. Singh has formed a new, competing business with Willey to offer training and services in clinical diagnosis, treatment, and therapies for craniofacial and dental sleep medicine.

2

Singh is in breach of the employment agreements, and this new competing business has, and will continue to cause, cause immediate and irreparable harm.

Thus, Vivos has been irreparably damaged as its trade secrets are being disclosed by Singh and used by Singh and Willey in their new competing business. The harm is immediate if Singh and Willey are permitted to go forward with the first training on January 30, 2023 through February 1, 2023, as upon information and belief, it incorporates and has been built on Vivos' trade secrets. Koala Plus has been marketed to the same target customers and clients of Vivos. Singh's involvement with Koala Plus is in violation of his employment agreements. Damages will only grow should Singh and Willey's illegal and improper use of Vivos' proprietary and confidential information of its devices and methodology, Vivos requests an emergency *ex parte* temporary restraining order barring Singh and Willey from further using Vivos' proprietary and confidential trade secrets, and barring Singh from breaching the restrictive covenants of the employment agreements.

## FACTUAL ALLEGATIONS

**A.    Vivos' Business**

Vivos is a medical device technology company focused on the development and commercialization of innovative solutions for patients with sleep-disordered breathing, including obstructive sleep apnea, that develops and markets a number of specially designed, customized and pre-formed oral appliances, which are integrated into a patient-specific, multi-disciplinary clinical protocol that is used by trained providers. Exhibit 1, R. Kirk Huntsman Declaration, ¶ 3 ("Huntsman Dec.").

Vivos' business is focused on a patented oral appliance technology and related treatments and training called The Vivos Method. *Id.* at ¶ 4. Vivos believes its proprietary oral appliances and associated protocols represent a significant improvement in the treatment of mild to moderate OSA versus other available treatments or protocols. *Id.* at ¶ 5. The Vivos Method, an advanced therapeutic protocol, represents the first non-surgical, non-invasive and cost-effective treatment for people with dentofacial abnormalities and/or mild to moderate obstructive sleep apnea ("OSA") and snoring in adults. *Id.* at ¶ 6. The Vivos Method often combines the use of customized oral appliance specifications and proprietary clinical protocols developed by the company and prescribed by specially trained dentists in cooperation with medical colleagues. *Id.* at ¶ 7.

Vivos' has relationships with a vast network of dental and medical providers who offer Vivos' appliances to patients. *Id.* at ¶ 8. Vivos' program to train dentists and offer them other value-added services in connection with their ordering and use of The Vivos Method for patients is called the Vivos Integrated Practice ("VIP") program. *Id.* at ¶ 9. Key topics covered in our training include case selection, clinical diagnosis, appliance design, adjunctive therapies, instructions on ordering Vivos and third-party products, guidance on pricing, instruction on insurance reimbursement protocols and interacting with Vivos' proprietary software system and the many features within the Vivos Method. *Id.* Vivos' trainings are in a highly personalized, deep immersion workshop format that provides VIPs and providers access to a team who is dedicated to creating a successful integrated practice. *Id.* at ¶ 10.

In addition to providing VIPs with appliances for use with their patients, Vivos offers other products and services to VIPs, including (i) SleepImage home sleep apnea test rings ("SleepImage"), which can be leased to VIPs for use with patients; (ii) training and continuing

education at the Vivos Institute training center, (iii) the Billing Intelligence Service ("BIS"), a subscription-based billing solution for VIPs, (iv) the Company's Medical Integration Division ("MID"), which manages independent medical practices under management and development agreements and (v) MyoCorrect, a service through which VIPs can provide orofacial myofunctional therapy ("OMT") to patients via telemedicine technology ("MyoCorrect"). *Id*. at ¶ 11.

**B.      Protection of Confidential Trade Secrets**

Vivos maintains its products and methods, and all research and development, as confidential trade secrets and are not disclosed to the public. *Id*. at ¶ 12. Vivos has taken significant steps to prohibit its innovative and proprietary methods and appliances from disclosure in order to protect its trade secret status. *Id*. at ¶ 13. Vivos has instituted stringent employee policies to protect disclosure of its confidential trade secrets. Vivos has a detailed Employee Handbook that contains several policies that prohibit the use or disclosure of confidential information. *Id*. at ¶ 15. For example, the Employee Handbook "Welcome Message" states the following: "We expect you to keep certain information confidential. Confidential Information is defined as 'all information in which its loss, undue use or unauthorized disclosure could adversely affect the Company's interests, image and reputation or compromise personal and private information of its members.'" *Id*. at ¶ 16.

The Employee Handbook also contains several explicit confidentiality policies. The Conflicts of Interest policy states that "[m]isusing privileged information or revealing confidential data to outsiders" constitutes improper behavior under the policy. *Id*. at ¶ 17. Additionally, the Confidential Information Policy states the following:

The protection of confidential business information and trade secrets is vital to the interests and success of Vivos Therapeutics. Confidential information is any and all information disclosed to or known by you because of employment with the Company that is not generally known to people outside the Company about its business.

*Id*. at ¶ 18. An employee who improperly uses or discloses trade secrets or confidential business information will be subject to disciplinary action up to and including termination of employment and legal action, even if he or she does not actually benefit from the disclosed information. *Id*. at ¶ 19. Vivos required Singh to agree to the terms of the Employee handbook as a condition of his employment. *Id*. at ¶ 20.

Vivos maintains its trade secrets as these serve the basis of its business – its devices, intellectual property, and the Vivos Method. Vivos requires all dentists that participate in its VIP program to sign strict confidentiality agreements regarding intellectual property. Vivos required Singh to agree to the terms of the Employee handbook as a condition of his employment. *Id*. at ¶ 21. Vivos' trainings and classes are taught through its proprietary and password protected systems or at an authorized Vivos Institute Facility where access is limited to qualified providers. *Id*. at ¶ 22. Vivos further ensures that all production and manufacturing labs are under confidentiality and non-disclosure agreements. *Id*. at ¶ 23. Vivos also requires its employees to agree to and sign a Non-Disclosure and Invention and Copyright Assignment Agreement. *Id*. at ¶ 24. As a condition of his employment, Singh agreed to the terms of the Non-Disclosure and Invention and Copyright Assignment Agreement. *Id*. at ¶ 25. The confidentiality of these trade secrets is paramount to Vivos business, and disclosure of these trade secrets would give a competitor company the ability to develop a competing product and methodology.

### C.    Singh's Employment with Vivos

In August and September 2016, Vivos acquired the business and operations of BioModeling Solutions, Inc. ("BMS"). *Id*. at ¶ 26. At the time of the acquisition, Singh served as the founder, majority shareholder, and Chief Executive Officer of BMS. *Id*. at ¶ 27. BMS was engaged in the manufacture and sale of the patented DNA appliance and U.S. Food and Drug Administration ("FDA") cleared MRNA appliance, together with other proprietary treatment protocols that would ultimately form the basis of the Vivos Method. *Id*. at ¶ 28. Vivos acquired this proprietary information as part of the transaction and directly paid Dr. Singh for these rights. *Id*. at ¶ 29. While at Vivos, Singh held multiple positions including Chief Medical Officer ("CMO"), President, and Director. *Id*. at ¶ 30.

On May 6, 2017, Singh, represented by his counsel throughout all negotiations, executed an Employment Agreement with Vivos as Chief Medical Officer ("CMO") ("2017 Employment Agreement"). *See* Exhibit 2; *see also* Exhibit 1 at ¶ 31. The 2017 Employment Agreement included Vivos' Non-Disclosure and Invention and Copyright Assignment Agreement. *See* Exhibit 2 at ¶ 8 and Addendum D; *see also* Exhibit 1 at ¶ 31. Singh's employment was "subject to the requirement that Employee sign, observe, and agree to be bound, both during and after Employee's employment" by the Non-Disclosure and Invention and Copyright Assignment Agreement. *Id*. at ¶ 8.

On October 9, 2020, Singh, again represented by his counsel throughout the negotiations and acting upon the advice of his own independent counsel, executed an Amended and Restated Executive Employment Agreement ("Amended Employment Agreement"). *See* Exhibit 3; *see also* Exhibit 1 at ¶ 32. The Amended Employment Agreement contains the restrictive covenants of non-

competition and non-solicitation, to protect Vivos' "business interests, including but not limited to confidential or trade secret business information, relationships with customers, the goodwill of the Company, and loyalty to Company." *See* Exhibit 3 at ¶ 4. The Amended Employment Agreement "constitutes the full understanding and entire employment agreement of the Parties, and supersedes and is in lieu of any and all other understandings or agreements between" Vivos and Singh, "including the 2017 Agreement" other than that which is specifically set forth in the Amended Employment Agreement. *Id.* at ¶ 8. The Amended Employment Agreement incorporated Addendum D of the 2017 Employment Agreement, the Non-Disclosure and Invention and Copyright Assignment Agreement, and it was made a part of the Amended Employment Agreement. *Id.* at ¶ 4(g).

In this Amended Employment Agreement, Singh agreed to the non-competition covenant, which states that for a period of twenty-four (24) months after the date of termination, Singh "will not, directly or indirectly, for Executive's own account or on behalf of any other person, company or entity (and whether as an employee, director, officer, shareholder, associate, partner, manager, agent, advisor, independent contractor, consultant or otherwise) engage in a Competitive Business within the Restricted Area." *Id.* at ¶ 4(a). The Amended Employment Agreement defined a Competitive Business as "any business whose products, services, or activities compete in whole or in part with the products services, or activities of Company, or planned products, services, or activities in which Executive was involved, during Executive's employment with Company." *Id.* at ¶ 4(a)(i). The term "Restricted Area" is defined as "the States of Colorado and New Mexico and any other state within the United States in which Vivos has maintained an office or Vivos

Integrated Provider located in that state in the twelve (12) month period preceding the Termination

Date." *Id.* at ¶ 4(a)(ii).

Singh also agreed to non-solicitation in the Amended Employment Agreement. *Id.* at ¶

4(b). The non-solicitation agreement provided that for a period of twenty-four (24) months after

his termination, Singh

> will not, either personally or as an employee, agent, director, officer, shareholder, associate, partner, manager, agent, advisor, independent contractor, proprietor, consultant or otherwise: . . .
>
> (i) directly or indirectly solicit or accept business from or otherwise divert from Company any customers or prospective customers of Company for products of services that are similar to or competitive with products or services offered or sold by Company, or planned products, services, or activities in which Executive was involved, during Executive's employment with Company;
>
> (ii) directly or indirectly attempt to attract any actual or prospective customer, supplier, or vendor away from Company or use information regarding Company's customers, suppliers, or vendors in any way which would detrimentally affect Company; . . . and
>
> (iv) undertake, or engage in, any employment or business activities involving the disclosure or use of Company's intellectual property, trade secrets, or Confidential Information.

*Id.* at ¶ 4(b)(iv).

During his employment, Singh was involved in the research and development of Vivos'

current products and services, along with next generation versions of the products and services.

Exhibit 1 at ¶ 33. Singh, as CMO, actively employed individuals on his team to work on the

research and development of Vivos' products and services. *Id.* at ¶ 34. Singh, through his

employment, had knowledge of all such products and services, current and next generation, of

Vivos. *Id.* at 33.

**D.    New Business and Improper Conduct of Singh and Willey**

On March 1, 2022, Vivos terminated Singh for cause. *Id.* at ¶ 35. In approximately December 2022, Vivos learned that Singh had formed a new business with Willey to train dental and medical professionals in craniofacial and dental sleep medicine. *Id*. at ¶ 36. Vivos learned Koala Plus trains dentists and medical practitioners on the methods and treatments developed by Vivos, and as integrated into The Vivos Method, its products, and other facts of its business model. *Id.* at ¶¶ 37, 38.

Singh and Willey had formed Koala Plus to bring comprehensive airway, breathing and sleep care to patients in need.[1] Singh was to share "his years of knowledge and research in the Koala Plus Residency Program. *Id.* Singh developed Koala Plus with Willey, to develop a curriculum and methods, based on the proprietary and confidential information developed at Vivos, and as acquired by Vivos from Singh, to provide a residency program, provide training to dental and medical practitioners, and provide other services and products. *Id.* at ¶¶ 39 and 40. As such, Willey has learned of Vivos' trade secrets. Together, Singh and Willey have used Vivos' trade secrets to develop Koala Plus and its offerings. Their new business is the "merging of world-renowned research of Dr. Singh and the clinical expertise of Dr. Willey" to offer "doctors, dentists, orthodontists and their teams an a la carte menu of services and training sessions for the treatment of airway, breathing, sleep and TMD issues." *See* Exhibit 4.

---

[1] https://koalaplus.org/about

In addition to the residency program, Koala Plus offers back-office support, including administrative and medical billing services, offered through customized packages. *See* Exhibit 5, pp. 9-10. It also offers "educational training systems" that "are developed for doctors, clinical assistants, and business managers" to "offer a transdisciplinary approach" as it believes the "key to success management of sleep disordered breaching treatment is an integrated" approach. *Id.* at pp. 11-12. Koala Plus competes with Vivos. Exhibit 1 at ¶ 41.

Singh's and Willey's illegal and improper use of Vivos' trade secrets has adversely affected and significantly damaged Vivos' interests and image. Every use, or developed training and service of Koala Plus, that is based upon Vivos' trade secrets, is an improper and illegal misappropriation of Vivos' trade secrets. Singh has no authority to share Vivos' trade secrets and has done so without Vivos' consent. *Id.* at ¶ 42. Singh owes a duty to Vivos to maintain the confidence of Vivos' trade secrets, in addition to the agreements he has signed. Singh knew or should have known that he had no authority to disclose or use Vivos' trade secrets. Additionally, Singh knew or should have known that he had no authority to use Vivos' trade secrets to develop and start a new company. Willey knew or should have known that Singh owed a duty to Vivos to maintain its trade secrets. Willey knew or should have known that Singh did not have Vivos' consent to disclose or use Vivos' trade secrets.

Even after the December 15, 2022 cease-and-desist letters to both Singh and Willey, both persisted in continuing Koala Plus and offer the services that use Vivos' trade secrets. *Id.* at ¶ 40; *see also* Exhibits 6 and 7. Singh and Willey knowingly misappropriated Vivos' trade secrets and refuse to cease. Singh and Willey knowingly and intentionally caused damage and irreparable

harm to Vivos. Thus, Vivos requires an immediate and permanent injunction preventing Singh's and Willey's continued illegal and improper use of Vivos' trade secrets.

Furthermore, Singh agreed to non-competition and non-solicitation in his employment agreements, for a period of twenty-four months after his termination. *See* Exhibit 3, ¶ 4. Despite this, Singh continued to form and develop Koala Plus, a business that competes with Vivos. Singh is directly involved in Koala Plus, in its creation, teaching trainings, and developing the business and its services and products. Koala Plus was formed by Singh and Willey, and it is specifically "to bring comprehensive airway, breathing and sleep care to patients in need" with an integrated approach to dental and medical providers. *See* Exhibit 5, p. 1. Vivos is focused on the development and commercialization of innovative solutions for patients with sleep-disordered breathing, including obstructive sleep apnea, with an integrated, multi-disciplinary clinical protocol used by trained dental and medical providers. *See* Exhibit 1 at ¶ 3. Koala Plus solicits and accepts business from Vivos' clients and customers, therefore diverting customers and prospective customers from Vivos, to similar and competitive products and services that are offered by Koala Plus. Further, Singh's engagement and involvement in the business activities of Koala Plus involves the disclosure of Vivos' intellectual property, trade secrets, and confidential information. Singh has intentionally breached the restrictive covenants of non-competition and non-solicitation of the employment agreements. Even after the cease-and-desist letters were issued to Singh and Willey, no changes have been made to Koala Plus and Singh remains an integral part of the competing business. Singh's breaches have caused damage and irreparable harm to Vivos.

## ARGUMENT

Vivos seeks a TRO to prevent Singh and Willey from further misappropriating Vivos' trade secrets and from competing with Vivos. First, because Vivos will suffer irreparable harm, Vivos may proceed with this Motion *ex parte*. Second, Vivos can establish each of the elements necessary to obtain a TRO, so this Court should grant Vivos' Motion. Third, this Court should not require Vivos to post a security or bond because Singh and Willey will not suffer any harm should this Court enjoin him from misappropriating Vivos' trade secret and competing with Vivos in breach of the employment agreements. This Motion will address each issue in turn.

**A.      This Court should issue an *ex parte* TRO to protect Vivos from irreparable injury.**

Vivos will suffer irreparable harm absent an *ex parte* TRO. Under Fed. R. Civ. P. 65(b)(1), "[t]he court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney" if the movant presents

> (A.)    specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>
> (B.)    the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Both conditions have been met here. Huntsman has set forth specific facts in the attached affidavit showing that Vivos will suffer immediate and irreparable injury, loss, or damage before Singh and Willey can be heard in opposition to this TRO. *See* Exhibit 1, at ¶¶ 40, 43-46. Most importantly, Singh and Willey have marketed and will be holding a conference on January 30, 2023 – in a week of this Motion – that directly competes with Vivos and integrates Vivos' trade secrets, to be shared with the conference's participants as part of Koala Plus's trainings. Once this

information is illegally and improperly released by Singh and Willey, there is no way for Vivos to claw it back and prevent the irreparable harm.

Singh and Willey have misappropriated Vivos' trade secrets to build a business that offers a residency program, trainings, an a la carte of services, and other activities – the same of which Vivos provides – and which target the same customers and clients of Vivos. Not only has Singh and Willey misappropriated Vivos' trade secrets, but Singh persists on competing with Vivos despite the binding contracts he has signed, containing non-competition and non-solicitation provisions. Singh and Willey will continue to profit, at the expense of Vivos and its reputation, off the misappropriation of Vivos' trade secrets and business in violation of Singh's employment agreements. These illegal and improper acts erode at Vivos' business and reputation.

Singh has breached the employment agreements, and together, Singh and Willey seek to cause irreparable harm to Vivos. Vivos will suffer irreparable injury absent the *ex parte* TRO. Due to the January 30, 2023 conference, Vivos will be immediately and irreparable harmed before Singh and Willey can be heard in opposition. Additionally, this Court has issued an *ex parte* TRO in very similar circumstances. *See, e.g., Complete Fire Prot., Inc. v. Kolman,* No. 19-CV-1134-WJM-STV, 2019 WL 1755280, at *1 (D. Colo. Apr. 19, 2019) (issuing *ex parte* TRO to enjoin former employee from misappropriating trade secrets he received while still employed).

Further, cease-and-desist letters were issued to Singh and Willey on December 15, 2022, notifying each of their illegal and improper misappropriation of trade secrets, breach of the employment agreements, and notice of litigation should they fail to respond. *See* Exhibits 6 and 7. To date, neither Singh or Willey have responded to the cease-and-desist letters and have not made any changes to Koala Plus. Exhibit 1 at ¶ 40. Lastly, undersigned counsel emailed a copy of the

Complaint in this matter, as well as this TRO, just before filing to Singh's counsel. *See* Exhibit 8, D.C.COLO.LCivR 65.1(a)(2) Certification, ¶ 4(a). Undersigned counsel has also mailed a copy of the Complaint in this matter, as well as this TRO, to Willey. *Id.* at ¶ 4(b). Undersigned counsel has also hired a process server to serve both Singh and Willey with the Complaint and this Motion. *Id.* at ¶ 4(c). Because Vivos has met both elements necessary to obtain an *ex parte* TRO, this Court should issue the TRO without written or oral notice to Singh or Willey.

**B.    This Court should immediately enjoin Singh and Willey from misappropriating Vivos' confidential and proprietary trade secrets.**

Vivos requires an immediate TRO to protect its confidential and proprietary trade secrets, including information such as research and data of its devices and treatment methodologies, and of acquired trade secrets, from further misappropriation and to preserve its reputation, position in the market, and economic relationships.

> A party seeking a temporary restraining order or preliminary injunction must show (1) a substantial likelihood that the movant eventually will prevail on the merits; (2) that the movant will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest.

*Kolman,* 2019 WL 1755280, at *1 (quoting *NRC Broad. Inc. v. Cool Radio, LLC*, No. 09-CV-02076-REB, 2009 WL 2965279, at *1 (D. Colo. Sept. 14, 2009)). The purpose of a temporary restraining order is to "preserv[e] the status quo and prevent[ ] irreparable harm just so long as is necessary to hold a [preliminary injunction] hearing, and no longer." *Id.* (alterations original) (quoting *Granny Goose Foods, Inc. v. Bhd. Of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974)). Vivos has met each element for its trade secret claims and its breach of contract claim. Thus, Vivos asks this Court to grant its Motion.

1. **Vivos will succeed on the merits of its breach of contract claim and trade secret claims.**

    a) **Breach of contract claims**

Vivos is likely to succeed on the merits of its breach of contract claim. To succeed on its breach of contract claim, Vivos must show (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance, (3) failure to perform the contract by the defendant; and (3) resulting damages. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

First, Singh has signed an employment agreement with Vivos which included non-competition and non-solicitation "for a period of twenty four (24) months after the Termination Date." Exhibit 3, ¶¶ 4(a) and (b). Second, Singh agreed to a tolling of the restrictive covenants, that should he breach any of the non-competition or non-solicitation terms of the agreement, "the duration of the restrictions contained in Section 4 shall be extended by the duration of time during which Executive was in violation of the same." *Id.* at ¶ 4(d). Further, Singh agreed to the Non-Disclosure and Invention and Copyright Assignment Agreement. *Id.* at ¶¶ 4(b) and 8. Third, Vivos performed under the employment agreements and Singh was employed by Vivos up until his termination.

Finally, Singh has breached the employment agreements by engaging in a competitive business within the restricted area and has undertaken and engaged in business activities that involve the disclosure and use of Vivos' intellectual property, trade secrets, and confidential information. These breaches cause damages to Vivos' business, reputation, and confidentiality of its proprietary information and trade secrets. Singh has been put on notice of the breaches, misappropriation of trade secrets, and potential litigation and yet, he has not ceased his illegal and

improper acts. Thus, Vivos will succeed on its breach of contract claim. So, this Court should grant

Vivos' TRO.

### b) Trade secret claims

Vivos is likely to succeed on the merits of its Defend Trade Secrets Act ("DTSA") and

Colorado Uniform Trade Secrets Act ("CUTSA") claims. To succeed on its DTSA claim, Vivos

must show

> (1) the existence of a trade secret that relates to a product or service used in,
> or intended for use in, interstate or foreign commerce; (2) the acquisition of
> the trade secret, or the use or disclosure of the trade secret without consent;
> and (3) the person acquiring, using, or disclosing the trade secret knew or
> had reason to know that the trade secret was acquired by improper means.

*DTC Energy Grp., Inc. v. Hirschfeld*, 420 F. Supp. 3d 1163, 1175 (D. Colo. 2019) (quoting *Arctic*

*Energy Servs., LLC v. Neal*, No. 18-cv-00108-PAB-KLM, 2018 WL 1010939, at *2 (D. Colo. Feb.

22, 2018)). A claim under the CUTSA requires a nearly identical showing. Plaintiff must show:

"[1] that he or she possessed a valid trade secret, [2] that the trade secret was disclosed or used

without consent, and [3] that the defendant knew, or should have known, that the trade secret was

acquired by improper means." *Id.* at 1176 (alterations original) (quoting *Gates Rubber Co. v.*

*Bando Chem. Indus., Ltd.*, 9 F.3d 823, 847 (10th Cir. 1993)). Vivos can show each element of both

its DTSA and CUTSA claims.

First, Vivos' proprietary and confidential information of its devices and treatment

methodologies are trade secrets. Both the DTSA and CUTSA define a trade secret similarly. Under

the DTSA, a trade secret is:

> all forms and types of financial, business, scientific, technical, economic, or
> engineering information, including patterns, plans, compilations, program devices,
> formulas, designs, prototypes, methods, techniques, processes, procedures,
> programs, or codes, whether tangible or intangible, and whether or how stored,

compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). Similarly, under the CUTSA, a trade secret is "the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value." C.R.S. § 7-74-102(4). Additionally, just like the DTSA, the CUTSA requires that the trade secret owner keep it confidential. "[T]he owner [of a trade secret] must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes." *Id.*

Vivos' design, treatment methodologies, and the basis that formed each, meets both claims' definitions. The designs and treatment methodologies are scientific and technical information, design, process, procedure, improvement, which are secrets and are of value as they form the foundation of Vivos' core business. Specifically, these trade secrets are competitively valuable to Vivos because the disclosure of these designs and treatment methodologies would enable competitors to develop the same designs and treatment methodologies, compete with Vivos, and erode Vivos' reputation and value. *See zvelo, Inc. v. Akamai Techs., Inc.*, No. 19-CV-00097-PAB-SKC, 2019 WL 4751809, at *3 (D. Colo. Sept. 30, 2019). ("A trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain,

but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret."). So Vivos' confidential and proprietary information of its designs, devices, and treatment methodologies are trade secrets under both the DTSA and the CUTSA.

Additionally, Vivos has taken significant steps to keep its proprietary, intellectual property, and scientific data confidential. Exhibit 1 at. ¶ 13. Vivos does not disclose its trade secrets to the public. *Id*. at ¶ 12. Further, Vivos has implemented strict confidentiality policies in its Employee Handbook that are a condition of continued employment. *Id*. at ¶¶ 14-20. Vivos requires all dentists that participate in its Integrated Practices to sign strict confidentiality agreements regarding intellectual property. *Id.* at ¶ 21. Vivos only teaches and trains dentists through its proprietary and password protected systems or at an authorized Vivos Institute Facility where access is limited to qualified providers. *Id.* at ¶ 22. Vivos also ensures that all production and manufacturing labs are under confidentiality and non-disclosures agreements. *Id.* at ¶ 23. And Vivos required, as a condition of his employment, that Singh sign, observe, and agree to a Non-Disclosure and Invention and Copyright Assignment Agreement. *Id.* at ¶¶ 20, 25; *see also* Exhibit 2, ¶ 8; Exhibit 3, ¶ 4, ¶¶ 4(g), 8. Thus, Vivos has taken more than enough steps to protect its designs, intellectual property, inventions, research and data as trade secrets.

Second, Singh acquired the trade secrets during his time as an employee of Vivos. During his employment, Singh worked on continuing to develop the Vivos products and methods, all of which are trade secrets of Vivos. *Id.* at ¶¶ 33-34. Singh knows or should have known that he was required to maintain the confidentiality of the trade secrets as it was integrated as part of his employment agreements. Despite this, Singh knew or should have known that he did not have

Vivos' consent to use the trade secrets in any way or to disclose the trade secrets to any unauthorized person, including Willey. Yet, Singh disclosed these trade secrets to Willey, and together, they formed a new and competing business that utilizes Vivos' trade secrets. Willey knew or should have known that Singh did not have Vivos' consent to disclose or use Vivos' trade secrets, and yet, Willey continues to work with Singh to misappropriate these trade secrets for their own benefit. Even after the cease-and-desist letters were issued, notifying both of their illegal and improper acts, both intentionally continue to misappropriate Vivos' trade secrets and have refused to even respond.

Singh and Willey will continue to misappropriate Vivos' trade secrets if they are allowed to continue offering its residency program and trainings to dental and medical professionals. Singh's and Willey's continued illegal and improper use of Vivos' trade secrets constitutes improper acquisition and use under the DTSA and CUTSA. Thus, Vivos will succeed on its DTSA and CUTSA claims. So, this Court should grant Vivos' TRO.

### 2. Absent the TRO, Vivos will suffer irreparable harm.

Vivos will suffer irreparable harm if the TRO does not issue. Monetary damages cannot remedy misappropriation of trade secrets. *Panorama Consulting Solutions, LLC v. Armitage,* No. 17-CV-01400-RM, 2017 WL 2929549, at *3 (D. Colo. July 10, 2017) ("The Court finds that a monetary remedy would not be effective in remedying Armitage's potential misappropriation of plaintiff's trade secrets."); *see also Port-a-Pour, Inc. v. Peak Innovations, Inc.*, 49 F. Supp. 3d 841, 872 (D. Colo. 2014) ("when a defendant possesses trade secrets and is in position to use them, harm to the trade secret owner may be presumed."). Each time Singh and Willey promote their business, obtain a new client, provide their platform for craniofacial and dental sleep medicine,

and train dentists and medical practitioners through trainings and the residency program, they are improperly and illegally misappropriating Vivos' trade secrets.

Most importantly, Singh and Willey will be providing their first training and offering on January 30, 2023 through February 1, 2023, and presenting their "new platform-independent approach to Craniofacial and Dental Sleep Medicine". This conference is aimed at the clients and customers of Vivos, as it is the same integrated methodologies of sleep medicine, and they will be sharing what is believed to be Vivos' trade secrets. An injunction is appropriate to prevent Singh from violating the employment agreements and competing with Vivos, and to prevent Singh and Willey from improperly and illegally misappropriating Vivos' trade secrets. Thus, the TRO would protect Vivos from irreparable harm.

### 3. The balance of hardships weighs in Vivos' favor.

Absent the TRO, Singh and Willey will continue to misappropriate Vivos' trade secrets, degrade Vivos' brand and reputation and value of its devices and treatment methodologies, and breaching the restrictive covenants. In contrast, under the TRO, Singh and Willey will suffer no harm at all because complying with trade secret law is not a hardship. *Armitage,* 2017 WL 2929549, at *3 ("The Court further finds that the balance of hardships weighs in plaintiff's favor because the Court is merely requiring Armitage to comply with the law."). Additionally, Singh cannot be allowed to breach the restrictive covenants, to develop a competing business and misappropriate Vivos' trade secrets for his own personal gain. So, the balance of the hardships weighs sharply in Vivos' favor and this Court should grant the TRO.

### 4. The TRO is not adverse to the public interest.

Last, granting Vivos' TRO would not be adverse to the public interest. "[A] temporary restraining order is not adverse to the public interest. To the contrary, it is in the public interest to protect trade secrets[.]" *Kolman,* 2019 WL 1755280, at *3. Here, the TRO will protect Vivos' trade secret from continued misappropriation and prevent further degradation of Vivos' brand, business, reputation, and value. Therefore, the TRO is in the public interest.

In sum, Vivos will succeed on its trade secret and breach of contract claims on the merits, will suffer irreparable harm absent the TRO, the balance of the hardships weighs strongly in Vivos' favor, and the TRO is in the public interest. Because Vivos has shown all of the elements required to obtain a TRO, this Court should grant Vivos' motion.

### C.        This Court should not require a bond.

This Court should not require a bond to issue this TRO. Rule 65(c) does state that a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, although Rule 65(c) "is phrased as mandatory, in practice this Court has discretion under this Rule whether to require a bond." *Kolman,* 2019 WL 1755280, at *3. And "[a] trial court has 'wide discretion' under Rule 65(c) in determining whether to require security." *Winnebago Tribe of Neb. v. Stovall,* 341 F.3d 1202, 1206 (10th Cir. 2003). No bond is necessary here because Singh and Willey will suffer no harm if they are enjoined from misappropriating Vivos' trade secrets and breaching the restrictive

covenants. At worst, they will have to comply with established trade secret law and the agreement of Singh. Thus, this Court should not require a bond.

## **CONCLUSION**

For the foregoing reasons, Vivos respectfully requests an Emergency *Ex Parte* Temporary Restraining Order restraining: Singh and Willey from:

A. Singh and Willey from holding the conference on January 30, 2023 through February 1, 2023 which misappropriates Vivos' trade secrets and competes with Vivos in spite of existing non-competition and non-solicitation agreements;

B. Singh and Willey from using, disclosing, disseminating, distributing, or copying Vivos' trade secrets, including its proprietary and confidential information, including but not limited to Vivos' devices, treatment methodologies, and scientific research and data;

C. Singh and Willey from continuing to operate Koala Plus which misappropriates Vivos' trade secrets and competes with Vivos in spite of existing non-competition and non-solicitation agreements;

D. Singh from engaging in a competitive business within the restricted area for a period of twenty-four months, including the tolling period; and

E. Singh from soliciting or accepting business from, or otherwise divert from Vivos, any customers or prospective customers for a period of twenty-four months, including the tolling period.

Dated: January 23, 2023.

Respectfully submitted,

*/s Michael A. Freimann*
Michael A. Freimann
Mamie Ling
Armstrong Teasdale LLP
4643 South Ulster Street
Suite 800
Denver, CO 80237
Telephone:  720.200.0676
Facsimile:  720.200.0679
mfreimann@atllp.com
mling@atllp.com

*Attorneys for Plaintiff Vivos Therapeutics, Inc.*